UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS  DIVISION

| | | |
|---|---|---|
| LARS ANKERSEN, | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | 1:06-cv-905-RLY-TAB |
| | ) | |
| OPTION CARE ENTERPRISES, INC., | ) | |
| Defendant. | ) | |

**ENTRY ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

This matter is before the court on Defendant, Option Care Enterprises, Inc.'s

("Defendant") motion for summary judgment.  For the reasons set forth below, the court

**GRANTS** in part and **DENIES** in part Defendant's motion.

**I.     Background**

Plaintiff, Lars Ankersen ("Plaintiff"), filed the present suit against Defendant, his

former employer, alleging that Defendant breached his employment agreement by

terminating him prior to the end of the term set forth therein.  Defendant counterclaimed

alleging that Plaintiff had materially breached the employment agreement by breaching

his contractual and common law duty of loyalty to Defendant, thus warranting his early

termination.  Defendant further alleges that Plaintiff's act of removing confidential files

from Defendant's office without permission constituted not only a breach of duty of

loyalty but also criminal conversion, tortious conversion, trespass to chattel, and breach

of Defendant's electronic security agreement and non-disclosure agreement.  Defendant's

1

present motion seeks summary judgment on Plaintiff's claim and Defendant's
counterclaims.

## II.    Summary Judgment Standard

Summary judgment is proper where "the pleadings, depositions, answers to
interrogatories, and admissions on file, together with the affidavits, if any, show that there
is no genuine issue as to any material fact and that the moving party is entitled to a
judgment as a matter of law." FED. R. CIV. P. 56(c).  The moving party bears the burden
of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp. v.
Catrett*, 477 U.S. 317, 323 (1986).  When a summary judgment motion is made and
supported by evidence as provided in Rule 56(c), however, the nonmoving party may not
rest on mere allegations or denials in its pleadings but "must set forth specific facts
showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e).

A genuine issue of material fact exists if "there is sufficient evidence favoring the
nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby,
Inc.*, 477 U.S. 242, 249 (1986).  Some alleged factual dispute that does not rise to a
genuine issue of material fact will not alone defeat a summary judgment motion. *Id*. at
247–48.  In deciding whether a genuine issue of material fact exists, the court views the
evidence and draws all inferences in favor of the nonmoving party. *Miranda v. Wis.
Power & Light Co.*, 91 F.3d 1011, 1014 (7th Cir. 1996).

**III.    Statement of Facts**[1]

**A.      F&F's Option Care Franchise**

1.    Defendant's business provides comprehensive care outside of hospitals to patients

      who have acute and chronic conditions.  (Declaration of Joseph Bonaccorsi

      ("Bonaccorsi Decl.") at ¶ 3, Defendant's Ex. B).  Defendant both operates its own

      treatment centers throughout the United States and grants franchises to third

      parties.  (*Id.* at ¶ 3).

2.    A third party named Ferguson & Fitzgerald, Inc. ("F&F") owned one of

      Defendant's franchises and operated two offices, one in Carmel and one in Fort

      Wayne, Indiana.  (Deposition of Lars Ankersen ("Plaintiff Dep.") at 11–12,

      Defendant's Ex. A).

3.    Part of F&F's franchise agreement with Defendant required F&F to pay Defendant

      a monthly royalty payment based on a percentage of its franchise's cash receipts.

      (Bonaccorsi Decl. at ¶ 6).

4.    Plaintiff, a friend of one of F&F's principals, Ronald Ferguson ("Ferguson"),

---

[1] The court finds it necessary to note both parties' violations of the local rules in filing
their summary judgment briefs and corresponding exhibits.  Plaintiff's fact section included in
his Response brief is single-spaced, in violation of Local Rule 5.1, making it difficult to read and
hard for the court to discern the material facts in dispute.  Defendant, on the other hand, violated
Local Rule 5.10 by failing to file each supporting exhibit as a separate attachment.  Defendant
labels eleven exhibits in his summary judgment appendix, yet those exhibits are attached
electronically as twenty-eight appendices with no designation as to which exhibits are included
in each appendix.  As a result of these violations, the court's review of Defendant's motion was
tedious and overly time-consuming.  The court requests that in the future, the parties strictly
adhere to the local rules in submitting their filings.

served as the President of F&F's Option Care franchise from late June 2002 until the franchise was purchased by Defendant.  (Plaintiff Dep. at 11, 31).

5.      While working for F&F, Plaintiff also had operational responsibilities for two other businesses F&F owned and operated out of its Fort Wayne office, Oxymed Inc. d/b/a WrenCare ("WrenCare"), which sold durable medical equipment, and Lakeside Pharmacy ("Lakeside"), which contracted with nursing homes to deliver medication to their patients.  (*Id.* at 12–13, 22, 25–26).

## B.      Defendant's Purchase of F&F's Option Care Franchise

6.      On April 11, 2005, Defendant purchased the assets of F&F's Option Care franchise, including furniture and fixtures, computers, patient records, and business and financial records, pursuant to an asset purchase agreement. (Bonaccorsi Decl. at ¶ 11; Asset Purchase Agreement, Defendant's Ex. B).

7.      After the execution of the asset purchase agreement, corporate representatives from Defendant came to both the Carmel and Fort Wayne offices to monitor operations and assist in the transition of the Option Care franchise from F&F to Defendant.  (Affidavit of Lars Ankersen ("Plaintiff Aff.") at ¶ 14, Plaintiff's Ex. 1).  These representatives expressed to the employees of those offices the theme that "nothing was going to change."  (*Id.*).

8.      After Defendant purchased the assets of F&F's franchise, Defendant hired Plaintiff as the general manager of the newly-purchased Carmel and Fort Wayne, Indiana offices.  (Plaintiff Dep. at 34).

4

9.     However, with Defendant's knowledge, Plaintiff continued to perform consulting services to F&F's other two business, WrenCare and Lakeside, pursuant to a consulting agreement between Plaintiff and F&F.  (*Id.* at 277–78; Employment Agreement at ¶ 6.5, Defendant's Answer Ex. A).

10.    Under this consulting agreement, F&F paid Plaintiff consulting fees totaling $250,000, and Plaintiff was eligible for two bonuses of $175,000.  (Plaintiff's Supplemental Interrogatory Answer No. 5, Defendant's Ex. B; F&F Consulting Agreement at ¶¶ 1(b), 1(c), Defendant's Ex. B).

11.    The separation of the F&F entities from the Option Care franchise and the transition between the companies did not occur until after the asset purchase closing date.  (Plaintiff Aff. at ¶ 19).

### C.     Plaintiff's Employment Agreement with Defendant

12.    As part of his employment with Defendant, Plaintiff signed a two-year employment agreement six to eight weeks after the asset purchase closing date of April 11, 2005, and the employment agreement applied retroactively from the closing date.  (Employment Agreement at ¶ 2; Plaintiff Dep. at 31).

13.    Under his employment agreement, Plaintiff received an annual salary of $120,000 and was eligible for Defendant's management incentive program.  (Employment Agreement at ¶¶ 3(a), (b)).

14.    As Defendant acknowledged that Plaintiff would still be performing services on behalf of F&F, Defendant included a duty of loyalty clause in Plaintiff's

5

employment agreement, which states: "[Plaintiff] accepts said employment, agrees that he has a duty of loyalty to [Defendant], and agrees to devote his full business time and effort to the fulfillment of the terms and conditions of his employment as contemplated herein." (*Id.* at ¶ 1). Further, Plaintiff agreed that he "may not act or accept responsibility [from F&F] which would prevent or otherwise interfere with his ability to render services for [Defendant] pursuant to this Agreement." (*Id.* at ¶ 6.5).

15.    Plaintiff's employment agreement contains an integration clause. (*Id.* at ¶ 9).

**D.    Defendant's Electronic Security and Non-Disclosure Agreements**

16.    In addition to his employment agreement, Plaintiff signed Defendant's "Acknowledgment Sheet For the Employee Electronic Information Security Guidelines" ("electronic security agreement") and "Non-Disclosure and Return of Property Agreement" ("non-disclosure agreement") on April 12, 2005. (Electronic Security Agreement, Defendant's Ex. B; Non-Disclosure Agreement, Defendant's Ex. B; Plaintiff's Dep. at 270–71).

17.    The electronic security agreement states in part:

> 1. I have received and read a copy of the "Employee Electronic Information Security Guidelines" and understand the same;
>
> 2. I understand and agree that any computers, software, and storage media provided to me by the company contains proprietary and confidential information about [Defendant] and its patients, and that this is and remains the property of the company at all times;

6

> 3.  I agrees [sic] that I shall not copy, duplicate (except for backup purposes as part of my job,) otherwise disclose, or allow anyone else to copy or duplicate any of this information or software . . . .

(Electronic Security Agreement at ¶¶ 1–3).

18.    The non-disclosure agreement states in part:

> 2.  I will not . . . remove any Confidential Information from [Defendant's] premises except as my duties for [Defendant] require.

> 3.  For purposes of this Agreement, "Confidential Information" shall mean all information relating to the present or planned business of [Defendant], or its parent company, or its franchisees, which has not been released publicly by an authorized [Defendant] representative.  I understand that Confidential Information may include, without limitation, trade secrets, know-how, inventions, clinical notes, marketing and sales programs, franchisee lists, Franchise Agreements, employee lists, customer lists, referral sources, payor contracts, patient and supplier information, medical records, financial data, software source codes and user manuals, pricing information, regulatory approval, reimbursement strategies, operations and clinical manuals, and information owned by [Defendant's] franchisees.

(Non-Disclosure Agreement at ¶¶ 2, 3).

### E.    Employees Working for F&F and Defendant

19.    Before Defendant purchased F&F's Option Care franchise, F&F employed

Jennifer Kelley ("Kelley") to perform human resource and bookkeeping functions

for its Option Care franchise, WrenCare, and Lakeside.  (Declaration of Jennifer

Kelley ("Kelley Decl.") at ¶ 2, Defendant's Ex. F).

20.    After the asset purchase, Defendant hired Kelley as the office manager of the

7

Carmel, Indiana, office, and she directly reported to Plaintiff, as she had done
while employed with F&F.  (*Id.* at ¶ 4).

21.   Defendant paid 100% of Kelley's compensation from the asset purchase closing
date through June 2005, but Kelley's responsibilities with respect to WrenCare and
Lakeside did not change.  (Plaintiff Dep. at 119, 130).

22.   During that period, Plaintiff did not seek permission from Defendant nor did he
inform Defendant that Kelley continued to work for F&F's other entities, while
she used Defendant's office equipment and space and Defendant paid her entire
salary.  (*Id.* at 130–32, 210–12).[2]  Likewise, Defendant did not tell Plaintiff that
Kelley performing work for F&F was prohibited.  (Plaintiff Aff. at ¶ 33).

23.   In July 2005, Defendant reduced Kelley's hourly wage, and F&F agreed to pay
Kelley a fixed amount of money each month for the work she continued to do for
F&F.  (Plaintiff Dep. at 134–36).

24.   Sometime in July or August 2005, Plaintiff told Kelley to start tracking the time
she spent working for Defendant and for F&F, after he realized that she had not

---

[2] Plaintiff alleges that during the asset purchase negotiations, Robert Monahan, the Vice
President of Acquisitions for Option Care, was informed by F&F that Kelley and V. Ankersen
would be performing services for F&F while employed by Defendant.  (Plaintiff Decl. at ¶ 29).
Further, Plaintiff alleges that Monahan approved of Kelley's and V. Ankersen's cross-company
work.  (*Id.*).  However, Plaintiff's declaration does not state *who* at F&F sought approval from
Monahan, and Plaintiff testified in his deposition that he did not seek approval for Kelley's and
V. Ankersen's F&F work.  (Plaintiff Dep. at 130–32, 210–12).  As such, the court will not rely
on Plaintiff's passive statement that Defendant "was informed," without any evidence of who
sought Defendant's alleged approval.  *See* FED. R. EVID. 602 (requiring that a witness have
personal knowledge of the facts about which he testifies).

been separating her time.  (*Id.* at 138, 140).

25.   Muguette Tanesky ("Tanesky") also worked for F&F's three businesses prior to
      Defendant purchasing F&F's Option Care franchise and was then hired by
      Defendant post-acquisition as a salaried employee.  (*Id.* at 18–19, 78).

26.   While employed by F&F, Tanesky was general manager of the Fort Wayne office,
      where all three F&F entities were located.  (Deposition of Muguette Tanesky
      ("Tanesky Dep.") at 17–18, Plaintiff's Ex. 5).

27.   Tanesky reported to Plaintiff before and after the asset purchase.  (*Id.* at 18, 23).

28.   After the asset purchase, Defendant hired Tanesky as operations manager of its
      Fort Wayne, Indiana, office.  (Declaration of Robert Monahan ("Monahan Decl.")
      at ¶ 10, Defendant's Ex. D).

29.   Tanesky's job responsibilities for WrenCare did not change after the asset
      purchase closing date, although Defendant paid 100% of Tanesky's salary.
      (Plaintiff Dep. at 44, 79).

30.   Plaintiff did not inform Defendant that Tanesky continued to perform job duties
      for WrenCare post-acquisition, while receiving no compensation from F&F.  (*Id.*
      at 102–03).

31.   Plaintiff's wife, Vicki Ankersen ("V. Ankersen") was hired by Defendant after the
      asset purchase as a controller.  (*Id.* at 119).

32.   She also did some work for F&F during this time, on Defendant's premises using
      Defendant's equipment.  (*Id.* at 119–20).

33.   F&F informally compensated Defendant for Kelley's and V. Ankersen's use of Defendant's equipment to do work for F&F by buying supplies, such as toner or paper, for Defendant's office equipment.  (*Id.* at 220–21).

## F.   Cross-Company Use of Defendant's Office Equipment and Space

34.   As part of the asset purchase agreement, Defendant purchased the office equipment (or the lease thereof) of F&F's Option Care franchise, including the phones, office furniture, copier, postage machine, and computer server.  (*Id.* at 161–63, 204–05).

35.   However, Defendant and the F&F entities continued to share the same telephone and fax numbers, the costs of which were paid by Defendant, and employees of the F&F entities still used some of the office equipment purchased by Defendant.  (*Id.* at 204–05).

36.   Plaintiff did not authorize the use of this office equipment by the F&F employees. (*Id.* at 164–65).

37.   However, WrenCare reimbursed Defendant for the copies and postage WrenCare's employees used.  (Tanesky Dep. at 163).

38.   In addition, Defendant and the F&F entities allocated between them the space of the Fort Wayne office, each paying its respective share of the lease, although some WrenCare employees maintained their desks in the common areas of the office allocated to Defendant.  (Plaintiff Dep. at 205–06).

39.   After the asset purchase, employees of WrenCare performed some services for

10

Defendant in the Fort Wayne office, including answering the phone, greeting Defendant's patients and taking them back to Defendant's suites for treatment, helping out Defendant's nurses in emergencies, doing deliveries for Defendant, and performing some therapies for Defendant. (*Id.* at 156–57; Tanesky Dep. at 147).

**G.    F&F's March and April Royalty Payments**

40.    On July 6, 2005, Kelley sent Plaintiff an email informing him that F&F had not paid Defendant its March 2005 royalty payment and asking whether she should pay it. (Plaintiff's Dep. Ex. 17, Defendant's Ex. B).

41.    Plaintiff responded: "I would sit on it and wait for them to request the money. I doubt they ever will." (*Id.*).

42.    The March royalty payment, based on F&F's cash receipts for that month, was $24,998.05 and remains due. (Bonaccorsi Decl. at ¶ 8).

43.    F&F also has not paid Defendant their final royalty payment of $6435.68 covering the period April 1–April 10, 2005, the part of April during which F&F still owned its Option Care franchise. (*Id.* at ¶ 9).

44.    At the time of this email exchange, Defendant had not requested the payment of the March royalty. (Plaintiff Aff. at ¶ 50). Plaintiff stated that he did not know whether Defendant had written off the March royalty payment. (*Id.* at ¶ 53).

45.    Plaintiff testified that it was inappropriate for him to instruct Kelley to sit on the March 2005 royalty payment that F&F owed Defendant. (Plaintiff Dep. at 148).

11

**H.      Plaintiff's Use of DLC Courier Service**

46.   In addition, Plaintiff employed the courier service DLC, which was owned by

Ferguson (one of F&F's principals and Plaintiff's friend), to deliver prescriptions.

(Plaintiff Dep. at 194–95).

47.   Prior to the asset purchase, Plaintiff had one of his employees compare DLC's

rates to those of other courier services.  (*Id.* at 194).

48.   DLC charged higher rates than other courier services due to the nature of the

prescription deliveries, which may be urgent and required a signature upon

delivery for patients' medical records, but Plaintiff continued to use DLC, despite

the higher rates, because of the quality of service DLC provided.  (*Id.* at 195–96).

49.   Plaintiff continued to use DLC after the asset purchase closing date, until one of

his superiors instructed him to start using an alternative courier service that was

cheaper.  (*Id.* at 197–98).

**I.      Plaintiff's Removal of Boxes from Defendant's Premises**

50.   On November 30, 2005, Plaintiff's supervisor told him to remove everything F&F-

related from Defendant's premises by December 15, 2005.  (*Id.* at 237–38).

51.   Plaintiff understood this to mean any boxes that were not owned by Defendant,

including F&F's pre-acquisition accounting records relating to F&F's Option Care

franchise.  (*Id.* at 239).

52.   However, Plaintiff did not discuss with his supervisor the specific items that he

was to remove.  (*Id.* at 238).

12

53.   On December 26, 2005, (when the office was closed) with Kelley's help, Plaintiff removed from Defendant's premises 20-25 boxes of documents containing financial information for F&F's pre-acquisition Option Care franchise that he thought belonged to F&F and had them delivered to Ferguson via a DLC courier van.  (Kelley Decl. at ¶ 16).

54.   Pursuant to the asset purchase agreement, however, all of F&F's pre-acquisition financial records relating to the Option Care franchise were purchased by Defendant and thus belonged to Defendant.  (Plaintiff Dep. at 241).

55.   These boxes of documents remain in the possession of F&F's attorney. (Declaration of William Wortel at ¶ 4, Defendant's Ex. K).

**J.   Plaintiff's Termination**

56.   Defendant terminated Plaintiff on January 11, 2006, for breaching his duty of loyalty, citing, *inter alia*, Kelley's and V. Ankersen's work for F&F using Defendant's resources and using the more-expensive DLC courier service. (Plaintiff's Termination Letter, Defendant's Ex. B).

57.   Before his termination, Plaintiff copied his Outlook folders onto a disk and took copies of severance agreements for other employees of Defendant to help dispute his termination.  (Plaintiff Dep. at 258, 261–62).

**V.   Discussion**

**A.   Breach of Contract and Breach of Duty of Loyalty**

Plaintiff alleges that Defendant breached his employment agreement by

13

terminating him prior to the end of the two-year term of employment set forth in the
agreement.  Defendant justifies Plaintiff's early termination on the ground that he
materially breached his contract by breaching the duty of loyalty set forth in the
agreement and imposed by common law.  As such, whether either party may maintain its
respective breach of contract claim and whether Defendant may maintain its common law
breach of duty of loyalty claim lies in the determination of whether Plaintiff breached his
duty of loyalty.

"A party first guilty of a material breach of contract may not maintain an action
against the other party or seek to enforce the contract against the other party should that
party subsequently breach the contract."  *Licocci v. Cardinal Assocs., Inc.*, 492 N.E.2d
48, 52 (Ind. Ct. App. 1986).  Likewise, a principal may terminate an agent before the time
fixed in the employment contract where the agent "has committed such a violation of duty
that his conduct constitutes a material breach of contract."  *Union Miniere, S.A. v. Parday
Corp.*, 521 N.E.2d 700, 703 (Ind. Ct. App. 1988) (quoting RESTATEMENT (SECOND) OF
AGENCY § 409(1) (1957)).  A serious violation of the agent's duty of loyalty constitutes
an entire breach of contract.  *Id.*  (citing RESTATEMENT (SECOND) OF AGENCY § 409(1)
cmt. b).  An agent breaches his duty of loyalty when he acts to undermine his principal's
business.  *Id.*  Whether an agent has breached his duty of loyalty and whether a party has
materially breached a contract are both questions of fact.  *See id.* at 704; *Wilson v.
Lincoln Fed. Sav. Bank*, 790 N.E.2d 1042, 1048 (Ind. Ct. App. 2003).

Defendant argues that Plaintiff breached his duty of loyalty first by "authorizing"

Kelley's and Tanesky's work for both F&F and Defendant, while Defendant paid 100% of their compensation. Kelley and Tanesky were employed by F&F before Defendant purchased F&F's Option Care franchise and were then hired by Defendant after the asset purchase. The evidence indicates that when F&F owned the Option Care franchise, the three businesses were run together. For example, Kelley performed bookkeeping functions for all three, and Tanesky was the general manager of the Fort Wayne office, where all three entities were located. No work to transition the Option Care franchise from F&F to Defendant was done until after the asset purchase. Further, there is no indication that Defendant set out a clear directive on transitioning former F&F employees, including Kelley and Tanesky, from F&F to Defendant. After the asset purchase, WrenCare and Lakeside were still run out of the Fort Wayne office, and even Defendant's corporate representatives reiterated the theme that "nothing was going to change" when the Option Care franchise changed hands. Although Plaintiff did not inform Defendant of Kelley's and Tanesky's continued responsibilities for the remaining F&F entities, Defendant did not direct Plaintiff to ensure that a complete separation of the entities was maintained, even though Defendant was aware that the remaining F&F entities were run out of the Fort Wayne office. Considering these facts together, the evidence of Kelley's and Tanesky's continued work for F&F while Defendant paid 100% of their compensation, of which Plaintiff was aware, does not indicate as a matter of law that Plaintiff was undermining Defendant's business to constitute a breach of duty of loyalty.

15

Defendant also argues that Plaintiff acted disloyally by "authorizing" F&F employees' use of Defendant's office equipment and space.  However, as indicated above, a clear division between the remaining two F&F entities and Defendant's newly purchased Option Care franchise was not effected.  Plaintiff testified that he did not "authorize" the use of Defendant's equipment by F&F employees.  Further, the evidence indicates that in the Fort Wayne office, a trade of services occurred after the asset purchase.  F&F employees answered the telephone on behalf of Defendant and greeted Defendant's patients in return for using some of Defendant's office equipment.  Although this informal compensation may not have been approved by Defendant, such an arrangement in an office shared by the three entities does not conclusively indicate that Plaintiff, who supervised the office, was acting to undermine Defendant's business in permitting the arrangement.

Defendant next asserts that Plaintiff's directive to Kelley to "sit on" F&F's $25,000 March 2005 royalty payment owed to Defendant constitutes a disloyal act. Under F&F's franchise agreement with Defendant, F&F was to pay Defendant a monthly franchise fee based upon F&F's monthly cash receipts.  In July 2005, after the asset purchase closing date, Kelley realized that F&F had not submitted its March 2005 royalty payment.  Defendant had not requested the payment.  Plaintiff admitted in his deposition that it was inappropriate to instruct Kelley to "sit on" the March 2005 royalty payment. However, he later testified that he was unsure whether Defendant had written off that royalty payment as part of the acquisition.  As Plaintiff's intention in directing Kelley not

to pay the royalty payment is in dispute, a factual question thus remains regarding whether Plaintiff's instruction to Kelley constitutes a material breach of Plaintiff's duty of loyalty.

Defendant also points to Plaintiff's use of the DLC courier service, which was partially owned by Ferguson, even though it was more expensive than other courier services. Defendant asserts that this was another way Plaintiff financially undermined Defendant to benefit his friend Ferguson and F&F. However, Plaintiff responds that he was willing to pay DLC's higher prices because of the sensitive nature of the deliveries for which he employed DLC and the quality of the service DLC provided. As with the other allegedly disloyal acts, Plaintiff's intent in using the more expensive courier service is unclear and, thus, a factual dispute exists for the jury's determination.

The last category of allegedly disloyal conduct includes Plaintiff's removal of confidential documents from Defendant's premises. In November 2005, Plaintiff's supervisor told Plaintiff to remove everything F&F-related from Defendant's premises. Pursuant to this direction, Plaintiff removed boxes containing F&F's pre-acquisition financial records and had them delivered to Ferguson. However, under the terms of the asset purchase agreement, those documents had been purchased by Defendant and should not have been delivered to Ferguson. Defendant argues that Plaintiff's removal of these documents was not accidental, but rather, was an attempt to remove from Defendant's possession documents relevant to litigation pending between F&F and Defendant. Plaintiff asserts, however, that he did not realize these financial records actually belonged

to Defendant at the time he removed them.

Further, upon learning of his impending termination, Plaintiff copied his Outlook folder and took copies of other employees' severance agreements reached with Defendant.  Defendant alleges that this "theft of confidential documents" constitutes another disloyal act by Plaintiff.  However, Plaintiff testified that he took those documents with him to help in disputing his termination.  While Plaintiff taking these documents with him upon his termination may have violated Defendant's confidentiality policies, violating such a policy is not necessarily a breach of duty of loyalty without evidence of Plaintiff's intent to use those documents to undermine Defendant's business. A genuine issue of material fact thus remains on whether Plaintiff taking the confidential documents breached his duty of loyalty.

As discussed above, whether Plaintiff's actions violated his duty of loyalty owed to Defendant is a question for the jury.  Because a genuine issue of material fact remains regarding whether Plaintiff breached his duty of loyalty, a genuine issue of material fact thus remains regarding whether Plaintiff materially breached his contract.  As such, the court **DENIES** Defendant's motion for summary judgment on Plaintiff's breach of contract claim and its counterclaims for breach of contract and breach of fiduciary duty of loyalty.

### B.      Conversion and Trespass to Chattel

The next category of claims Defendant asserts against Plaintiff involve Plaintiff's removal of F&F's pre-acquisition financial records from Defendant's premises.

18

Defendant claims that Plaintiff's actions constitute both criminal and tortious conversion and trespass to chattel.

### 1.   Criminal Conversion

"A person who knowingly or intentionally exerts unauthorized control over property of another person commits criminal conversion . . . ." IND. CODE § 35-43-4-3. The Indiana Crime Victim statute created a civil cause of action for criminal conversion. IND. CODE § 34-24-3-1; *see also Gilliana v. Paniaguas*, 708 N.E.2d 895, 899 (Ind. Ct. App. 1999). Criminal intent is an essential element to criminal conversion. *NationsCredit Commercial Corp. v. Grauel Enters., Inc.*, 703 N.E.2d 1072, 1078 (Ind. Ct. App. 1998). As discussed above, a dispute exists about Plaintiff's intent in taking F&F's pre-acquisition financial records (that were actually purchased by Defendant in the asset purchase agreement). Defendant alleges that Plaintiff knew those documents belonged to Defendant, but Plaintiff argues that he thought they belonged to F&F when he removed them from Defendant's premises. Because a factual dispute exists regarding an essential element of this claim—Plaintiff's intent—Defendant's motion for summary judgment on its criminal conversion claim is therefore **DENIED**.

### 2.   Tortious Conversion

The tort of conversion is defined as "the appropriation of the personal property of another to the party's own use and benefit, or in its destruction, or in exercising dominion over it, in exclusion and defiance of the rights of the owner or lawful possessor, or in withholding it from his possession under a claim and title inconsistent with the owner's."

19

*Dominiack Mech., Inc. v. Dunbar*, 757 N.E.2d 186, 188–89 (Ind. Ct. App. 2001) (quoting *Hunter v. Cronkhite*, 36 N.E. 924, 925 (Ind. Ct. App. 1894)).

In the present case, Plaintiff moved the disputed boxes of documents from Defendant's premises to the DLC courier van, which then delivered the documents to Ferguson.  Plaintiff does not now dispute that those documents belonged to Defendant at the time he took them.  Although Plaintiff was only in possession of the documents for a short period of time—from the time he removed them from storage on Defendant's premises until he placed them in the DLC van—Plaintiff exercised dominion over those documents during that period in exclusion of Defendant's rights.

While Plaintiff argues that Defendant's claim must fail because it has not proven its damages, damages are not an essential element to a tortious conversion claim. *Shourek v. Stirling*, 621 N.E.2d 1107, 1109 (Ind. 1993) ("The essential elements of [a conversion] claim are an immediate, unqualifed right to possession resting on a superior claim of title.").  As such, Defendant has established its claim for tortious conversion as a matter of law, and its motion for summary judgment on that claim is thus **GRANTED**.

### 3.      Trespass to Chattel

In order to establish a claim for trespass to chattel, a party must show one of the following: the trespasser dispossessed the claimant of his chattel; the trespasser impaired the chattel's condition, quality, or value; the trespasser deprived the claimant of the use of the chattel for a substantial period of time; or the trespasser caused bodily harm to the claimant or some other person or thing in which the claimant had a legally protected

interest.  *Terrell v. Rowsey*, 647 N.E.2d 662, 666 (Ind. Ct. App. 1995) (citing

RESTATEMENT (SECOND) OF TORTS § 218 (1965)).  In this case, Plaintiff removed

documents belonging to Defendant in December 2005 from Defendant's premises, and to

date, those documents have not been returned to Defendant.  Plaintiff dispossessed

Defendant of its chattel, i.e. its documents, which has resulted in the deprivation of such

chattel from Defendant for a substantial amount of time, nearly two years to date.

As with its tortious conversion argument, Plaintiff argues that Defendant has not

proven its damages, and thus, its trespass to chattel claim must fail.  However, damages

are not an essential element to *establish* a claim for trespass to chattel; rather, showing

damages is only necessary to *recover* under that claim.  *See Coleman v. Vukovich*, 825

N.E.2d 397, 407 (Ind. Ct. App. 2005).  Defendant's motion for summary judgment on its

claim for trespass to chattel (Counterclaim V) is therefore **GRANTED**.  The court will

hold a subsequent hearing to determine the extent, if any, of Defendant's damages for

both its tortious conversion and trespass to chattel claims.

### C.    Breach of Electronic Security and Non-Disclosure Agreements

Defendant last claims that by copying his Outlook folder onto a disk and taking the

disk with him upon his termination, Plaintiff breached Defendant's electronic security

agreement and non-disclosure agreement because those documents contained confidential

information.  Plaintiff responds that the electronic security agreement is not an

enforceable contract because it lacks an offer and consideration and, further, that both

agreements are superceded by the integration clause in Plaintiff's employment contract.

21

Turning to Plaintiff's first argument, "[a]n offer, acceptance, plus consideration make up the basis for a contract." *DiMizio v. Romo*, 756 N.E.2d 1018, 1022 (Ind. Ct. App. 2001). An offer is defined as "the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his consent to that bargain is invited and will conclude it." *Barnum v. Review Bd. of Ind. Employment Sec. Div.*, 478 N.E.2d 1243, 1245 (Ind. Ct. App. 1985) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 24). Under Indiana law, continued employment is adequate consideration to support an enforceable contract. *Ackerman v. Kimball Int'l, Inc.*, 634 N.E.2d 778, 781 (Ind. Ct. App. 1994), *adopted in part and vacated, on other grounds, in part by Ackerman v. Kimball Int'l, Inc.*, 652 N.E.2d 507, 509 (Ind. 1995).

Contrary to Plaintiff's assertion, the offer composing the electronic security agreement is the terms of the "Employee Electronic Information Security Guidelines," which are summarized in the electronic security agreement. The offer is not to copy or duplicate Defendant's software or storage media and to return Defendant's software, computer materials, etc. upon leaving employment with Defendant. Plaintiff accepted those terms as evidenced by his signature on the electronic security agreement. Further, the consideration for this agreement was Plaintiff's employment with Defendant—in exchange for his employment, Plaintiff agreed to abide by the electronic security guidelines. As such, the electronic security agreement is an enforceable contract. Plaintiff subsequently violated that agreement by copying his Outlook folder, part of Defendant's computer software, and taking that disk with him upon his termination.

22

Plaintiff next asserts that both the electronic security agreement and the non-disclosure agreement were superceded by the integration clause in his employment agreement. "[T]he integration clause of a contract is to be considered as any other contract provision to determine the intention of the parties and to determine if that which they intended to contract to is fully expressed in the four corners of the writing." *Franklin v. White*, 493 N.E.2d 161, 166 (Ind. 1986). While the interpretation of an unambiguous contract is generally a question of law for the court, the interpretation of an ambiguous contract requiring extrinsic evidence is a question for the fact-finder. *Grain Dealers Mut. Ins. Co. v. Wuethrich*, 716 N.E.2d 596, 598 (Ind. Ct. App. 1999).

The integration clause in Plaintiff's employment agreement reads:

> Entire Agreement. This Agreement contains the entire agreement and understanding of the parties concerning the subject matter hereto and all communications and other agreements of the entities, whether oral or written, as to the subject matter hereof are hereby superseded.

(Employment Agreement at ¶ 9). Contrary to Plaintiff's assertion, Defendant argues that the integration clause does not affect the Electronic Security and Non-Disclosure Agreements because the "subject matter" of Plaintiff's employment agreement does not discuss the matters addressed in those two previous contracts. While the crux of Plaintiff's employment agreement pertains primarily to the terms of Plaintiff's employment, including compensation, job responsibilities, etc., the employment agreement also has a clause addressing patient records. It states:

> Patient Records. All patient records and histories (the "Records") shall be the property of [Defendant] and shall remain in the possession of

23

[Defendant] upon termination of [Plaintiff's] employment hereunder. (Employment Agreement at ¶ 7).  Both the Electronic Security Agreement and Non-Disclosure Agreement address Defendant's policies on confidential information, including patient records.  Thus, it is unclear whether the parties intended that the "subject matter" of Plaintiff's employment agreement include Defendant's policies set forth in the Electronic Security and Non-Disclosure Agreements or whether the "subject matter" was intended to encompass only the specific terms of Plaintiff's employment. This ambiguity in Plaintiff's employment agreement can only be resolved by resort to extrinsic evidence and is thus a question for the jury.  Defendant's motion for summary judgment on its claims for breach of the electronic security agreement and breach of the non-disclosure agreement is therefore **DENIED**.

## VI.   Conclusion

For the reasons set forth above, Defendant's motion for summary judgment (Docket # 50) is **DENIED** on Plaintiff's claim for breach of contract and Defendant's claims for breach of contract, breach of fiduciary duty of loyalty, criminal conversion, and breach of the electronic security and non-disclosure agreements.  Defendant's motion

for summary judgment is **GRANTED** on its claims for tortious conversion and trespass

to chattel.

**SO ORDERED** this 16th day of January 2008.

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Electronic copies to:

Patrick F. Mastrian III
BROWN TOMPKINS & LORY
pmastrian@brown-tompkins-lory.com

Brian L. McDermott
OGLETREE, DEAKINS, NASH, SMOAK & STEWART
brian.mcdermott@odnss.com

Jena M. Valdetero
BRYAN CAVE LLP
jena.valdetero@bryancave.com

William J. Wortel
BRYAN CAVE LLP
bill.wortel@bryancave.com